# Cahaba Coal Co., *et al. v.* Veitch.

*Bill to Enforce Constructive Trust.*

(Decided April 9, 1914. 65 South. 75.)

1. *Trusts; Constructive Trusts; Evidence.*—The evidence examined and held not to show that the property was purchased by the respondents under the complainants alleged option, or other elements of a constructive trust, and hence, complainant was not entitled to enforce a constructive trust on a fourth interest therein.

2. *Vendor and Purchaser; Option; Consideration.*—Where no consideration was given for an option to purchase, such option created no rights in the person to whom it was given.

3. *Same; Contract.*—The inquiry by an intending purchaser whether the owner will take a sum certain for the property, is neither an implied agreement to pay such sum, nor an admission that the property is of that value.

APPEAL from Jefferson Chancery Court.

Heard before Hon. A. B. BENNERS.

Bill by George Veitch, Jr., against the Cahaba Coal Company and others, to enforce a constructive trust. From a decree for complainant, respondents appeal. Reversed and rendered.

The property is certain coal property in the state of Kentucky, valued at $50,000. The theory of the bill is that the property was purchased pursuant to a common understanding between complainant and the respondent named in the bill; that the title was acquired by one of respondents, the Cahaba Coal Company, under an option held by complainant, and with his consent upon the condition that he was to own a one-fourth joint interest as pay for his time and expenses in investigating the property; that the officers of the company, with whom he had conducted his various negotiations, viz., Bowers, Miller, and Middleton, agreed to buy out his interest in case the company and not the officers should purchase; and that all of them had denied to them any interest or share in the property or enterprise after acquiring the title by his consent. The only witnesses examined were the complainant and the three individuals above named and one jackman, the agent of the owner for the sale of the property in question. The option papers are as follows: "Henderson, Ky., June 18, 1910. George Veitch, Birmingham, Ala. Dear Sir: I hereby give you the option of purchasing the property of the Corydon Coal Company, consisting of mine and proximately 1,400 acres of coal located at Corydon, Ky., between this date and July 15, 1910, at and for the sum of $50,000, $5,000 of which to be paid in cash when titles are proved, transfers made, and $5,000 per annum until remainder is paid, but hereby reserve the right to sell said property after giving you four days' notice of in-

tention so to do. Deferred payments to bear 6 per cent. per annum interest. [Signed] L. S. Jackman."

Plaintiff's testimony is substantially as follows: Complainant had some information about the plant and property of the Corydon Coal Company of Kentucky, and talked with defendant Miller and Bowers as to its purchase. They told him to go and inspect the property, and report to them, and, if it was good as anticipated, they would furnish the money to buy it, and would give complainant a one-third interest in it for his trouble and expense in looking it up. He went to Kentucky about June 1, 1910, inspected the property, ascertained the terms upon which it could be bought, and brought back samples of the coal. He reported the matters, and, after some discussion, it was agreed that Miller and Bowers would furnish the money for the cash payment, and the working capital if they decided the property was worth buying, and that complainant should receive a one-third interest for time and expenses incurred, and should also go and manage the property as superintendent. They wanted to know about the mining laws and mineral rights deed in Kentucky, and asked him to go back to Kentucky and get up this information, and Miller would join him there for a joint inspection of the property. Complainant went back to Kentucky about June 5th, and was notified that Miller could not go, but Middleton would go instead. He and Middleton were carried out to the property by Jackman, a real estate broker, and they inspected it together. Complainant asked for an option for himself, which Jackman gave him, and he and Middleton returned to Birmingham, and at Middleton's request he left the option with him for the others to see. A day or two later he called on Miller and Bowers, who requested that Middleton be allowed to come in, each

taking with complainant a one-fourth interest, to which complainant assented; the future payments to be made out of the property. They were to let him know in a few days, and they next saw him on July 9th, not together, but separately. Miller then asked him for his proposition, which he repeated to Miller as above stated. Miller spoke of the Cahaba Coal Company buying the property, but complainant objected to going into the purchase other than as individuals. Complainant saw Miller, Bowers, and Middleton all together a day or two afterwards, and asked for their final decision, and they replied they would not buy other than through the Cahaba Coal Company. Complainant replied that he had other parties interested, and would let the present matter drop, not caring to go in that way. They said they wanted the property, and complainant said that if the complainant said that if the company bought it they would have to buy him out. Miller then left, and Middleton said they would buy complainant out, to which he assented. Middleton asked complainant if he would take $2,500, and complainant said he would, but no offer was made. Middleton then dictated a letter as follows (addresses to complainant) : "This is to advise you that the Cahaba Coal Company has decided to take over the property of the Corydon Coal Company under the terms of option given to you under date of June 18, by L. S. Jackman. [Signed] Cahaba Coal Company, by R. C. Middleton, President." This letter was signed and left with the stenographer, from whom complainant got it several days later without having had any further conversation with any of defendants. Complainant then went to Kentucky to arrange for carrying out the deal, and found the company had already closed the deal on July 7th, and had taken possession on July 13th.

The defendants Miller, Bowers, and Middleton each

testified that they had had several conversations with complainant about this property, but they denied they had requested him to go to Kentucky, and also denied that they had ever agreed or proposed to purchase the property jointly with him, or to give him any interest whatever in it, or to place him in charge of the mine when bought. They state their only plan was to buy, if at all, for the company, that Middleton examined the property for the company, and they informed complainant at all times they would only buy for the company, and that complainant said he could get up about $2,000, to get an interest in the mine, and it was suggested that he take some stock in the company if the purchase was made. Middleton testified that the paper called an option was given at his request by Jackman; that it was handed to him, and afterwards placed in the company's safe at Birmingham. He testified in reference to the letter above set out that "Mr. Veitch came into the office, and I told him that we were going to buy the property, and he asked me for some kind of a letter, as he wanted to see Mr. Jackman and collect some commission." He also testified that at that time complainant said that he would like to have a one-fourth interest in the property, and he told complainant he had no objection to his coming in, but he could do so only by purchasing stock in the company. He asked complainant how much money he could get up, and, on his replying about $2,-000, Middleton said, "I don't see how you could buy a fourth interest in $40,000 of property for $2,000."

On cross-examination complainant stated that when he went to Kentucky, after getting the letter announcing that the Cahaba Company would buy, he tried to stop the trade; that he wanted to know that he would be taken care of before it went any further. He stated further: "I did not talk to Mr. Jackman about not get-

ting anything out the case, but Mr. Jackman said that, if the Cahaba Company did not take care of me on the trade, he would help me on my expenses himself." On this point Jackman testified that complainant suggest- ed to him at the time that, as he was not to get any- thing out of the trade from the Alabama parties, he ought to get something from Jackman or his associates, and that Jackman agreed to make him an allowance of $300 or $400 to cover his time and expenses.

On final hearing the decree dismissed the bill as to the individual defendants, but held the coal company liable to complainant as trustee of the constructive trust in the sum of $2,500, with interest from July 11, 1910.

CAMPBELL & JOHNSTON, for appellant. Where no money is advanced by the beneficial claimant, and there is nothing more in the alleged transaction than is im- plied from the breach of a parol agreement, equity will not declare the real purchaser a trustee.—*Manning v. Pippin,* 95 Ala. 537; 117 Pa. 192; 159 Ill. 120. The evi- dence does not make a case of constructive trust, and the chancellor's decree should be reversed and one here rendered for respondents.

HENRY UPSON SIMS, for appellee. The use of the op- tion without consent, and the subsequent acquisition of title with knowledge that complainant insisted upon a fourth interest in the lands, was sufficient considera- tion as under said circumstances the law requires but little consideration.—*Sanford v. Hammer,* 115 Ala. 406; *Butts v. Cooper,* 152 Ala. 375. But other considera- tions sufficiently appeared.—*Kent v. Dean,* 128 Ala. 600, and authorities there cited.—22 Pac. 849; 24 N. W. 857; 8 Wall. 202. The title was acquired by fraud, and

the trust became ex malaficio, and enforceable as such.
—*Spies v. Price,* 91 Ala. 168; *Mosely v. Mosely,* 86 Ala..
28; Perry on Trusts, § 232. Where a trustee had been
guilty of a devastavit in selling the trust res, he can be
held to an accounting in form of a money decree, and
must account for the highest value of the res.—*Irby v.
Kitchell,* 42 Ala. 438; *Rose v. Gibson,* 71 Ala. 35;
*Thompson v. Thompson,* 107 Ala. 163; 8 Wall. 202; *Harrison v. Mock,* 10 Ala. 185; 17 Ves. 144; 5 Bevan. 486;
5 Russell 42.

SOMERVILLE, J.—On the evidence adduced we are
impelled to the conclusion that the complainant has failed to satisfactorily establish the material and vital contentions upon which alone his alleged equity could be
grounded. The weight of the testimony is against his
claims, to say nothing of their inherent inprobability in
certain particulars as indicated by the evidence.

It is supposed by complainant that, regardless of the
want of any agreement made or obligation assumed by
respondents, with respect to the purchase of the property, they are nevertheless bound to account to him for
an interest of definite value, because (1) he told them
they would have to buy him out if they bought for the
company; (2) Middleton, president of the company, inquired of him if he would take $2,500 for his interest in
the matter (this several days after the company had
purchased), and he had said he would; and (3) the
company bought under complainant's exclusive and
valuable option right, and is therefore bound by an implied obligation to pay the definite amount stated, for
an interest impliedly recognized by the alleged inquiry.
We have given this theory of complainant's case due
consideration and think it is wholly lacking in merit.

The paper called an "option" was a mere nudum pactum, and not only conferred no exclusive right of pur-

chase upon complainant, but created no right at all in favor of any one. Without consideration of any sort, it was without legal value or effect. It did not enable complainant to buy, and was no obstacle to respondents' independent purchase if they chose to acquire the property. Its physical custody by respondents, however obtained, was of no advantage to them, and of no detriment to complainant. Respondents could not purchase under it without complainant's written transfer of his rights thereunder, had it been a valuable and binding contract. It is evident that, though respondents may have bought the property under the terms stated in the memorandum offer to complainant, they in fact bought, and the owners sold, in entire disregard of it. Certainly it is an idle misnomer to say that they used complainant's option because they had the physical custody of a mere memorandum of the terms upon which the property could be bought, although it was nominally addressed to complainant.

The fundamental fallacy of complainant's theory lies in the unfounded assumption that he was offering something of value owned by himself, coupled with a condition; and that, in accepting his offer, respondents were bound by the condition previously named to them. But, as we have seen, he had nothing to offer; and, when respondents bought, they were not accepting his offer, but only the offer of the owners of the property. His consent to the purchase and sale was futile and unnecessary, and his opposition would have been equally so.

It might be observed further, though not necessary to our conclusion, that even an actually intending purchaser's inquiry whether the vendor would take a certain sum for his interest is neither an implied agreement to pay such a sum nor an admission that the subject-matter of the proposed sale is of such a value. Hence

it follows that the decree for $2,500 against respondents, as the agreed value of the supposed trust estate, was without support in the evidence. And there was no evidence upon which even an actual interest in this property and enterprise could have been deemed of value to its owner, if, indeed, it would not have been a serious financial calamity to him.

We repeat the complainant's case, however meritorious it might be in the abstract, cannot survive the united denials of the three respondents with respect to its essential features; and, out of the sterile soil of actually proven conditions, a constructive trust, one of the flowers of equity jurisprudence, cannot be made to grow.

The decree of the chancery court was erroneous, and must be reversed. Let a decree be here rendered denying relief to the complainant, and dismissing his bill of complaint.

Reversed and rendered.

ANDERSON, C. J., and MCCLELLAN and SAYRE, JJ., concur.